Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| L.C., and F.C.,<br><br>         Plaintiffs,<br><br>vs.<br><br>BLUE CROSS and BLUE SHIELD of TEXAS, and the MADISON ONE HOLDINGS HEALTH BENEFITS PLAN.<br><br>         Defendants. | COMPLAINT<br><br>Case No. 2:21-cv-00319 DBP |

Plaintiffs L.C. and F.C., through their undersigned counsel, complain and allege against Defendants Blue Cross and Blue Shield of Texas ("BCBSTX") and the Madison One Holdings Health Benefits Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. L.C. and F.C. are natural persons residing in Denton County, Texas. L.C. is F.C.'s father.

2. BCBSTX is an independent licensee of the Blue Cross and Blue Shield network of providers and acted as third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

1

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). L.C. was a participant in the Plan and F.C. was a beneficiary of the Plan at all relevant times. L.C. and F.C. continue to be participants and beneficiaries of the Plan.

4. F.C. received medical care and treatment at Change Academy Lake of the Ozarks ("CALO") from January 22, 2018, to January 15, 2020. CALO is a licensed residential treatment facility located in Missouri, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. CALO specializes in treating individuals suffering from reactive attachment disorder.

5. BCBSTX denied claims for payment of F.C.'s medical expenses in connection with her treatment at CALO.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because BCBSTX does business in Utah through its network of affiliates. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"),

2

an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### F.C.'s Developmental History and Medical Background

9. F.C. was born in Guatemala and was adopted around the time that she was five months old. F.C. was relatively well adjusted until the time she was in the sixth grade, however around that time she became very depressed and struggled with the fact that she was adopted. F.C. also started seeing a therapist.

10. F.C. started habitually lying, even about things that didn't matter. She was given a psychosocial evaluation and was diagnosed with ADHD, dyslexia, and a learning disorder. F.C. was caught talking to boys on the internet without permission and when confronted she refused to give up her phone and flew into a violent rage. She also obsessively followed a boy at school that she liked to the point that the boy's mother contacted L.C. and asked him to intervene.

11. F.C. started expressing suicidal ideation which became significantly worse after she was sexually assaulted by a peer. F.C. increasingly isolated herself and started refusing to go to school. In the middle of one of F.C.'s therapy sessions, her therapist interrupted the session to contact L.C. to recommend an immediate assessment at a psychiatric hospital. F.C. was then hospitalized for several days.

12. F.C. started abusing Xanax and frequently ran away from home. She acted out physically and would punch holes in the walls or kick in fences. F.C. often threatened self-harm, physically attacked her parents, and had frequent encounters with the police.

13. Between December 2016, and June 2017, F.C. had six acute inpatient hospitalizations. She also had multiple enrollments at the partial hospitalization and intensive outpatient levels of care. After completing a hospitalization at the Menninger Clinic on July 10, 2017, F.C. was then admitted to an outdoor behavioral health program. This was followed by a residential treatment program. But despite these interventions, F.C. continued to exhibit troubling behaviors such as a desire to kill herself, and even made attempts to do so by taking actions such as running into the road.

14. F.C. was then once more admitted to an acute psychiatric program followed by yet another outdoor behavioral healthcare program called Pacific Quest. F.C.'s stay at Pacific Quest only lasted for two days, after which she was asked to leave the program due to her refusal to stop self-harming.

15. F.C. was once again hospitalized and continued to exhibit aggressive behaviors such as breaking a tv by throwing a remote at it. F.C.'s treatment team stated that she was suffering from attachment and abandonment issues, Post-traumatic Stress Disorder, and likely also had Borderline Personality Disorder.

### CALO

16. F.C. was admitted to CALO on January 22, 2018, with BCBSTX's approval.

17. In a letter dated August 21, 2019, BCBSTX denied payment for dates of service May 21, 2018, through July 25, 2018. The letter stated in part:

    > Per the medical necessity provision of your benefit plan, a medical necessity review has been completed. Based on the information provided, you did meet MCG care guidelines Residential Acute Behavioral Health Level of Care, Child or Adolescent (B-902-RES) 20th edition until 05/20/2018. However, you did not meet for [sic] MCG care guidelines Residential Acute Behavioral Health Level of Care, Child or Adolescent (B-902-RES) 20th Edition after 05/20/2018 for the following reasons: Your mood improved. You no longer had thoughts of ending your life. You did not have thoughts of harming others. You were not aggressive.

4

> You were not psychotic. You were not manic. You took care of your daily activities. You were medically stable. From the information provided, you could have been safely treated in a different setting such as Mental Health Partial Hospital/Day Treatment. The last covered day is 05/20/2018.

18. In a letter dated August 22, 2019, BCBSTX denied payment for F.C.'s treatment at CALO for dates of service August 19, 2018, through August 19, 2019. The letter gave the following justification for the denial:

    > Per the medical necessity provision of your benefit plan, a medical necessity review has been completed. Based on the information provided, you do not meet MCG care guidelines Major Depressive Disorder: Residential Care (B-008-RES) 23rd Edition for the following reasons: You are not a danger to yourself. You are not a danger to others. You have supportive family. You are medically stable. You are tolerating medications. You could be treated at a partial hospital program. From the information provided, you can be safely treated in a different setting such as Mental Health Partial Hospital/Day Treatment. The last covered day is 8/18/18
    >
    > The criteria used in making the adverse determination was MCG.
    >
    > The specialty of the Medical Director that made the adverse determination was Psychiatry.

19. On February 4, 2020, L.C. appealed the denial of F.C.'s treatment from May 21, 2018, through January 15, 2020. L.C. reminded BCBSTX of its obligations under ERISA, including its responsibility to take into account all of the information he provided, to utilize appropriately qualified reviewers and disclose their identities, to give him the information necessary to perfect the claim, to act in his best interest, and to provide him with a full, fair, and thorough review.

20. L.C. noted that neither of the denial letters he had received evaluated the correct dates of service, he asked BCBSTX to correct this error. He pointed out that both of the letters placed acute level requirements such as, "[y]ou are not a danger to yourself" as a justification to deny F.C.'s non acute treatment.

5

21. L.C. contended that this constituted a non-quantitative treatment limitation in violation of MHPAEA. He wrote that MHPAEA compelled insurers to offer behavioral health coverage "at parity" with comparable medical or surgical benefits. L.C. identified skilled nursing facilities as one of the medical or surgical analogues to residential treatment and contended that if BCBSTX were to require individuals to exhibit acute level symptoms to qualify for residential treatment, it would also need to do so for skilled nursing facilities. L.C. stated that this would be akin to requiring an individual to be currently experiencing a heart attack before their skilled nursing treatment could be approved.

22. L.C. described this limitation as "completely inappropriate" and stated that sub-acute facilities like residential treatment or skilled nursing facilities were "neither expected to treat, nor equipped to handle" individuals displaying acute level symptoms.

23. L.C. asked if his assertion that the Plan was not compliant with MHPAEA was incorrect that it "explain in detail exactly why we are incorrect" using specific evidence to back up its claims.

24. L.C. contended that BCBSTX's criteria were flawed in other respects as well. He noted that BCBSTX had applied criteria for depression but had not taken into account F.C.'s other significant mental health issues such as her Reactive Attachment Disorder, which he described as "an extremely complex and notoriously difficult disorder to treat."

25. L.C. accused BCBSTX of attempting to force F.C. into a lower level of care and of violating generally accepted standards of medical practice. L.C. referenced a court ruling in *Zoe W. v Regence BlueCross BlueShield* in which an insurer had used the same acute inpatient criteria as BCBSTX to evaluate sub-acute residential treatment. He wrote that the court had ruled that the insurance company's criteria were inappropriate and that it

limited residential treatment to a short-term duration regardless of the circumstances of the individual patient.

26. L.C. also wrote concerning *Wit v. United Behavioral Health* in which an insurer was found to overemphasize acuity and crisis stabilization, failed to address effective treatment of co-occurring conditions, pushed patients into a lower level of care regardless of whether this treatment was appropriate or effective, failed to account for the unique needs of children, and limited care through the use of mandatory prerequisites.

27. In addition, L.C. referenced *Dominic W. v Northern Trust Company Employee Welfare Benefit Plan* in which an insurer was found to have acted in an arbitrary and capricious manner by requiring the presence of acute symptoms, regardless of whether acute symptoms had been exhibited previously in portions of treatment that had been previously authorized, disregarding the opinions of the patient's treating physicians, cherry picking evidence, and disregarding whether prior treatment had been ineffective.

28. L.C. asserted that BCBSTX acted in a manner the courts had found impermissible in *Wit, Dominic W.,* and *Zoe W*. He argued that BCBSTX could point to no meaningful change in F.C.'s condition between the portion of treatment that it authorized and what it denied. L.C. posited that BCBSTX denied payment based on a predetermined date based on a preconceived notion of how long residential treatment should last rather than F.C.'s actual needs.

29. L.C. contended that F.C. had not yet been able to be treated successfully at a lower level of care or via inpatient hospitalization, and that she even required three hospitalizations while attending CALO. He argued that F.C.'s treatment was clearly medically necessary but BCBSTX had terminated it prematurely to preserve its own financial interest by

imposing requirements and enforcing criteria which were not in accordance with generally accepted standards of medical practice. L.C. requested that BCBSTX utilize the express terms of the insurance policy rather than proprietary criteria which he alleged to be flawed.

30. L.C. pointed out that F.C. had frequent episodes of self-harm as well as attempts at suicide even in the secure environment of a residential treatment center and even with one-on-one supervision.

31. L.C. requested in the event the denial was upheld that he be provided with the specific reasoning for the determination along with any corresponding supporting evidence, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized to evaluate the claim, any mental health, substance use disorder, skilled nursing facility, rehabilitation, or hospice criteria used to administer his insurance plan, and any reports from any physician or other professional regarding the claim. (collectively the "Plan Documents")

32. On May 14, 2020, L.C. submitted a complaint to the Texas Department of Insurance. ("TDI"). L.C. stated that after submitting his appeal he received a letter dated February 20, 2020, stating that a completed "Standard Authorization Form" was necessary to process the appeal. L.C. stated that he provided this document but BCBSTX had still not processed his appeal.

33. L.C. wrote that he contacted BCBSTX on April 2, 2020[1] and was told the appeal was still under review. On April 16, 2020, L.C. again contacted BCBSTX and was told that the appeal appeared to still be under review and the representative would investigate and call

---

[1] L.C.'s contact was done through a representative.

him back. After L.C. was not called back, he again contacted United and was told the appeal review had been closed but the representative could not see what the decision had been. The representative stated they would research this and get back to him.

34. L.C. wrote that he was contacted on May 12, 2020 and was told that his appeal had not been processed as it did not explicitly state that it was an appeal. L.C. contended that this was false, and his appeal clearly described itself as such. L.C. asked TDI to compel BCBSTX to review his appeal and properly process his claims.

35. In a letter dated June 18, 2020, BCBSTX upheld the denial for dates of service from May 20, 2018, through July 29, 2018. The letter was ostensibly based on the MCG Care Guidelines Residential Acute Behavioral Health Level of Care (Child/Adolescent) Guidelines, 21st edition, however the denial rationale was word-for-word identical to the August 22, 2019, denial which stated it was based on guidelines for Major Depressive Disorder.

36. BCBSTX additionally sent the Plaintiffs a series of additional letters (approximately twenty nearly identical letters) all bearing the same June 18, 2020, date, with the same justification for denying care, except these letters stated that "The last covered day is 08/18/18."

37. In a letter dated June 22, 2020, BCBSTX denied payment for F.C.'s treatment from August 19, 2019, to January 15, 2020, again based on the MCG Residential Acute Behavioral Health Guidelines and because:

> You were cooperative with treatment. You had supportive family involved in your care. You had made progress in your mood and anxiety symptoms. You no longer needed 24 hour care. You could have done partial hospital care. It was available in your home area. From the information provided, you can be safely treated in a different setting such as Mental Health Partial Hospital/Day Treatment. The last covered day is 8/18/18

38. In a letter dated June 29, 2020, BCBSTX partially overturned its denial of payment for service dates May 21, 2018, to July 25, 2018, because F.C. was found to have satisfied its acute criteria due to aggression, acts of self-harm, thoughts of harm to self or others, and running away.

39. In a letter dated June 30, 2020, BCBSTX reviewed dates of service August 19, 2018, to January 15, 2020, and stated that coverage was not available under residential acute care guidelines due to:

    > You were cooperative with treatment. Your mental health symptoms had improved. You had developed healthy coping skills. Your family was supportive. You went home to visit your family often. Your functioning was good. At times you had thoughts to harm yourself and others, but these were passive thought. [sic] You did not appear to be imminently dangerous. At times you had mild attempts to harm yourself, but these behaviors were not severe and could have been managed at a lower level of care. You had no severe aggression toward others. You had no severe psychosis. You had no severe medical issues. From the information provided, you could have been safely treated in a different setting such as Mental Health Partial Hospital/Day Treatment. The last covered day is 08/18/2018.

40. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

41. The denial of benefits for F.C.'s treatment was a breach of contract and caused L.C. to incur medical expenses that should have been paid by the Plan in an amount totaling over $375,000.

42. BCBSTX failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of L.C.'s request.

//

//

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

43. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSTX, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

44. BCBSTX and the Plan failed to provide coverage for F.C.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

45. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

46. BCBSTX engaged in numerous procedural violations in its review of F.C.'s claims, including repeatedly failing to evaluate the complete dates of F.C.'s service in spite of the fact that L.C. directed it to do so, failing to respond to the Plaintiffs' appeal entirely until L.C. submitted a complaint to TDI, and issuing a denial letter which gave a justification for denying care which was word-for-word identical to a previous denial despite the fact that each was ostensibly based on distinct guidelines.

47. BCBSTX and the agents of the Plan breached their fiduciary duties to F.C. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in F.C.'s interest and for the exclusive purpose of providing benefits to ERISA

participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of F.C.'s claims.

48. The actions of BCBSTX and the Plan in failing to provide coverage for F.C.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

49. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of BCBSTX's fiduciary duties.

50. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

51. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

52. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of

benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

53. The medical necessity criteria used by BCBSTX for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

54. The level of care applied by BCBSTX failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

55. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved. L.C. pointed out that even while at CALO, F.C.'s safety was in such jeopardy that she required three acute hospitalizations.

56. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for F.C.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

57. For none of these types of treatment does BCBSTX exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

58. When BCBSTX and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

59. BCBSTX and the Plan evaluated F.C.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice.

60. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

61. One of the primary examples of disparate application of medical necessity criteria between medical/surgical and mental health treatment is BCBSTX's reviewers improperly utilization of acute medical necessity criteria to evaluate the non-acute treatment that F.C. received. BCBSTX's improper use of acute inpatient medical necessity criteria is revealed in the statements in BCBSTX's denial letters such as, "You no longer had thoughts of ending your life. You did not have thoughts of harming others."

62. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that F.C. received.

63. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

64. BCBSTX openly and explicitly acknowledged in its denial letters that the criteria used to evaluate F.C.'s treatment are acute level criteria, not only from the actual requirements imposed, but also by directly referring to them in the denial letters as acute level criteria.

65. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

66. L.C. referenced numerous court cases where the court had found the use of acute level criteria to be impermissible when applied to sub-acute residential treatment.

67. L.C. contended that BCBSTX had not identified what changes had occurred in F.C.'s treatment to make her treatment no longer medically necessary after its last approved date.

68. L.C. accused BCBSTX of employing factors such as the application of acute criteria to deliberately limit the duration of residential treatment regardless of the particular needs of the insured in order to preserve its own financial interests.

69. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice.

70. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

71. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCBSTX, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and

more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

72. L.C. requested that BCBSTX address his arguments that it was in violation of MHPAEA using specific and detailed examples.

73. He also requested to be provided with a copy of the Plan Documents.

74. The Defendants did not address in any substantive capacity the Plaintiffs' allegations that BCBSTX and the Plan were not in compliance with MHPAEA nor did they provide a copy of the Plan Documents.

75. The violations of MHPAEA by BCBSTX and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

   (a) A declaration that the actions of the Defendants violate MHPAEA;

   (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

   (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

   (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

   (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

76. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for F.C.'s medically necessary treatment at CALO under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 21st day of May, 2021.

By     s/ Brian S. King
        Brian S. King
        Attorney for Plaintiffs

County of Plaintiffs' Residence:
Denton County, Texas