THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| L.C. and F.C.,<br><br>     Plaintiffs,<br><br>v.<br><br>BLUE CROSS AND BLUE SHIELD OF TEXAS,<br><br>     Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING [44] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING [49] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00319-DBB-JCB<br><br>District Judge David Barlow |

Before the court are the parties' cross-motions for summary judgment.[1] Plaintiffs L.C. and F.C. (collectively "Plaintiffs") brought suit against Defendant Blue Cross and Blue Shield of Texas ("Blue Cross") under the Employee Retirement Income Security Act of 1974 ("ERISA").[2] Plaintiffs contend that Blue Cross wrongly denied coverage for F.C.'s care at Change Academy Lake of the Ozarks ("CALO") and that Blue Cross violated the Mental Health Parity and Addiction Equity Act ("MHPAEA" or "Parity Act").[3] Having considered the briefing and relevant law, the court decides the matter without oral argument.[4] For the reasons below, the court grants Blue Cross's motion and denies Plaintiffs' motion.

---

[1] Def. Mot. for Summ. J. ("Def. MSJ"), ECF No. 44, filed Aug. 30, 2022; Pl. Mot. for Summ. J. ("Pl. MSJ"), ECF No. 49, filed Aug. 30, 2022.
[2] Compl., ECF No. 2, filed May 21, 2021.
[3] *See* 29 U.S.C. § 1001 *et seq.*
[4] *See* DUCivR 7-1(g).

# BACKGROUND

## Plan Coverage and Level of Care Guidelines

L.C. participated in a self-funded employee benefits plan (the "Plan") subject to ERISA.[5]

Blue Cross insures and administers the Plan.[6] L.C.'s daughter F.C. was a beneficiary.[7] The Plan

covers treatment for mental health-related conditions at various levels of intensity and

restrictiveness. The highest level of care is 24-hour inpatient hospital care.[8] Less intensive is care

at a Residential Treatment Center ("RTC"). An RTC is a "setting offering a defined course of

therapeutic intervention and special programming in a controlled environment" where "[p]atients

are medically monitored with 24[-]hour medical availability and 24[-]hour onsite nursing service

for Mental Health Care and/or for treatment of Chemical Dependency."[9] The next lower level of

care is a psychiatric day treatment facility in a partial hospitalization program ("PHP"). It

provides up to eight hours of treatment in a 24-hour period.[10] The Plan also covers intensive

outpatient programs[11] and traditional outpatient services.[12]

Blue Cross evaluates medical necessity for medical or surgical services and mental health

services.[13] A key part of such evaluations is the use of the Milliman Care Guidelines ("MCG").[14]

---

[5] Compl. ¶ 3.

[6] *Id.* ¶¶ 2–3; *see* ECF No. 47-27, HCSC_LC_45673–810.

[7] Compl. ¶¶ 1, 3.

[8] *See* ECF No. 47-27, HCSC_LC_45682, 45750–51.

[9] *Id.* at 45758.

[10] *See id.* at 45719, 45757.

[11] *See id.* at 45697, 45751 (offering "services for at least three hours per day, two or more days per week, to treat mental illness, drug addiction, substance abuse or alcoholism, or specializes in the treatment of co-occurring mental illness with drug addiction, substance abuse or alcoholism").

[12] Outpatient services "address deficits in psychological, behavioral, and/or cognitive functions." *Id.* at 45756; *see id.* at 45682.

[13] *See id.* at 45753; ECF No. 47-28, HCSC_LC_45932–37. Blue Cross may deny or reduce benefits if it deems that treatment or care is not medically necessary. ECF No. 47-27, HCSC_LC_45699.

[14] ECF No. 47-28, HCSC_LC_45935.

2

Two sets of guidelines are relevant to F.C.'s request for coverage. The first set is guidelines for

Residential Acute Behavioral Health Level of Care, Child or Adolescent ("MCG RTC").[15]

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████[16] The second set is the MCG for Major Depressive

Disorder ("MDD"): Residential Care ("MCG MDD").[17] Both sets have nearly identical criteria

for determining whether a patient has met discharge criteria:

████████████████████████████████████

██████████████████████████████████████
█████████████████████████

████████████████████████████████

██████████████████████████████████████
████████████

██████████████████████████████████████
███████████

██████████████████████████████████████
███████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████
████████████████

██████████████████████████████████████

██████████████████████████

---

[15] ECF No. 47-22, HCSC_LC_23089–91.
[16] *Id.* at 23089 n.A.
[17] ECF No. 47-18, HCSC_LC_9697–700.



[18]

Also relevant for MHPAEA purposes is the Plan's coverage for care at a skilled nursing facility ("SNF") and inpatient rehabilitation facility ("IRF"). A SNF is a "facility primarily engaged in providing skilled nursing services and other therapeutic services."[19] For admission, the member cannot have ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████[20] Admission to an IRF is also inappropriate if the member has ██████████████████

---

[18] ECF No. 47-22, HCSC_LC_23090–91. The MCG MDD are nearly identical to the MCG RTC. Other than one minor grammatical difference, the MCG RTC have an extra requirement under the ██████████████████ █████████████████████████████████████ *Compare id.* at 23091, *with* ECF No. 47-18, HCSC_LC_9699.
[19] ECF No. 47-27, HCSC_LC_45758.
[20] ECF No. 47-35, HCSC_LC_46220.

4

████ [21] The member's status must ██████████████████████████

██████████████████ [22] Several indicators exist for a member's readiness to discharge from

these facilities.[23]

**Admission to CALO**

F.C. began exhibiting behavioral issues in 2014.[24] She had six psychiatric inpatient

hospitalizations between December 2016 and June 2017.[25] In June 2017, F.C. was admitted to a

Houston psychiatric hospital.[26] The next month, F.C.'s parents enrolled her at a wilderness

therapy program in Idaho.[27] After three months, F.C. was sent to an RTC in Utah.[28] In December

2017, the RTC stated that it could no longer help her and so F.C.'s parents enrolled her in a

treatment program in Hawaii.[29] After two days, she went back to the Houston hospital.[30] Finally,

F.C.'s parents enrolled her at CALO, an RTC in Missouri.[31]

With preauthorization, F.C. was admitted to CALO on January 22, 2018.[32] At admission,

she was diagnosed with MDD, post-traumatic stress disorder ("PTSD"), reactive attachment

disorder of childhood, attention-deficit hyperactivity disorder, and specific learning disorder with

impairment in reading.[33] Blue Cross summarized the reasons for her admittance:

> [F.C.] presented to residential level of care from 27 days acute inpatient
> admission[,] . . . [she] had multiple treatment episodes at [intensive outpatient

---

[21] ECF No. 47-34, HCSC_LC_46202.
[22] *Id.*
[23] *See* ECF No. 47-35, HCSC_LC_46222; ECF No. 47-36, HCSC_LC_46234.
[24] ECF No. 47-8, HCSC_LC_7294.
[25] *Id.* at 7297.
[26] *Id.*
[27] *Id.* at 7298.
[28] *Id.*
[29] *Id.* at 7299.
[30] *Id.*
[31] *Id.*
[32] ECF No. 47-1, HCSC_LC_2; ECF No. 61-4, HCSC_LC_17539; Compl. ¶ 16; ECF No. 13, at ¶ 16.
[33] ECF No. 47-1, HCSC_LC_2.

> program], [partial hospitalization program] and outpatient level of care. [She] was
> initially admitted at the acute level of care for attempting to run into traffic and
> verbalizing suicidal ideation to overdose on medications. [She] also became
> combative throwing chairs, punching walls and verbally threatening others. [She]
> endorsed suicidal ideation and self-harming behavior as evidenced by . . . banging
> her head into a concrete [sic] floor. [She] reported active suicidal ideation but did
> not have specific plan after completing an inpatient stay. [She] stepped down to
> RTC level of care for continued stabilization.[34]

CALO established several goals for F.C.'s initial treatment plan: being safe enough to have

individual and family therapy, processing instead of displaying self-harming behavior, actively

working toward her treatment goals, abstaining from self-harming behaviors, taking her

medication, and using healthy language to communicate.[35] Her treatment would include weekly

meetings with a psychiatrist; weekly therapist-led group, individual, and family discussions;

weekly psychoeducational group discussions; weekly multi-modal, recreational, and daily milieu

therapy; daily canine therapy; and academics.[36]

**CALO from January 22, 2018, to August 18, 2018**

Four days after her admission to CALO, F.C. banged her head on the bathroom floor and

told staff that "she hurts herself sometimes[.]"[37] At a medication management update on January

28, 2018, F.C. self-reported a "lot of anger issues."[38] On January 29, F.C. left a team therapy

session and started rubbing her knuckles and arm on the wall.[39] Staff intervened four times.[40]

They noted that F.C. was using "Fruit cup lids to self-harm by scratching."[41] She tried to eat a

---

[34] *Id.*
[35] ECF No. 61-4, HCSC_LC_17542.
[36] *See, e.g.*, ECF No. 58-15, HCSC_LC_6561.
[37] ECF No. 47-7, HCSC_LC_4891.
[38] *Id.* at 4885.
[39] *Id.* at 4871–72.
[40] *Id.*
[41] *Id.* at 4876.

peanut "in the hope[] to ingest it and . . . kill herself."[42] Staff noted that her "impulsive behaviors seem to be fixated on making sure that staff were paying attention to her because of her loneliness and shame."[43] "Overall, [F.C.] is needing support and speaks this through the language of self[-]harm and at the same time does not have any specific plan to self[-]harm or hurt herself."[44]

On February 1, 2018, staff observed F.C. in the bathroom "trying to hang herself from the shower curtain" with a pair of jeans.[45] She said that she wanted to kill or hurt herself "[a]ll of the time."[46] F.C.'s doctor noted the following: February 3, "[F.C.] has a suicidal ideation with non[-]lethal gestures. [She] faked [a] head injury in an effort to leave [CALO]"; February 10, "therapist reproted [sic] that [she] needed safety closeness for suicidal ideations and needed physical intervention for attempted suicide"; February 17, "[s]he has recent suicidal ideation[s]"; March 3, "[she] has been self[-]harming because we will not send her home if she stops."[47] On March 8, staff found her "trying to wrap shorts around her neck to strangle herself."[48]

CALO transferred F.C. to a hospital on March 10 because she had gone four days without food or water.[49] She told staff that she wanted to harm herself by not eating or drinking "until

---

42 *Id.* at 4877. F.C. had a peanut allergy. *See* ECF No. 61-4, HCSC_LC_17529 (May 20, 2018 medication management update).
43 ECF No. 47-7, HCSC_LC_4877–78.
44 *Id.* at 4878.
45 ECF No. 47-26, HCSC_LC_43890.
46 *Id.*
47 ECF No. 47-6, HCSC_LC_4724.
48 ECF No. 47-17, HCSC_LC_9301.
49 ECF No. 47-1, HCSC_LC_2–3; ECF No. 47-2, HCSC_LC_8; ECF No. 47-17, HCSC_LC_9297–98.

[her] kidneys shut down."[50] She received intravenous fluids.[51] After her return to CALO, staff reported that her mood was okay but F.C. refused to eat or drink for another two days.[52]

On March 16, 2018, staff intervened when F.C. attempted to choke herself with a pair of pants.[53] The next day, she ate some pizza and told staff that she wanted to kill herself for overeating.[54] She also tried to strangle herself with a pair of pants in the bathroom, scratched her hands, and attempted to climb onto a top bunk to jump off head-first.[55] On March 19, F.C. tried to hit her head against the wall several times, she tried to tie a shirt around her neck, and she again climbed on her room's top bunk to jump.[56] The following day, staff intervened in response to F.C.'s property destruction, self-harm, and statements that she wanted to kill herself.[57] A March 22 therapist report stated that F.C. was content and hopeful with good insight and fair judgment.[58] "The goal [wa]s to have [her] transitioned in 9 days to enjoy her parents and grandma's visit."[59] Two days later, staff intervened due to F.C. scratching herself on the hand, attempting to hit her head against the wall, trying to attack a peer, and trying to jump head-first from the top bunk.[60]

On March 25 and 26, staff executed assists for self-harm attempts, aggressive and hostile behavior toward peers, and refusals to take medications, food, or drink.[61] Staff said that F.C.

---

[50] ECF No. 47-17, HCSC_LC_9298.
[51] *Id.* at 9297.
[52] *Id.*; ECF No. 47-6, HCSC_LC_4723 (repeating a March 17 therapist report).
[53] ECF No. 47-6, HCSC_LC_4763, 4769.
[54] *Id.* at 4763.
[55] *Id.*
[56] *Id.* at 4752.
[57] *Id.* at 4746, 4748.
[58] *Id.* at 4741.
[59] *Id.*
[60] *Id.* at 4729.
[61] ECF No. 62-32, HCSC_LC_41260.

wanted to "hit her head and cause brain damage and . . . end up on life support and then die."[62] On March 27, staff responded with multiple assists. F.C. told staff she was treating "it as a game . . . with seeing how many 'head bangs' she can get in while fighting staff[.]"[63] The next day, she had a dissociative experience. She was "say[ing] random things and [then] pacing back and forth."[64] On March 29, she had thoughts about self-harm and hurting others.[65]

On April 1, 2018, staff had to physically intervene when F.C. banged her head on a wall.[66] Later that day, F.C. stated to a doctor during a medication management review that she "still has fleeting suicidal thoughts" and "is losing hope because she is not getting any better and just wants to give up."[67] On April 2, she wrote staff a suicide note, tried to "cause 'brain damage' by banging her head," shoved medication down her pants, scratched others, and attempted to climb onto her room's top bunk.[68] She started punching walls after staff stopped her from picking objects from a wall on April 7.[69] Four days later, she punched and hit her head on a wall when her therapist was unable to attend a scheduled session.[70]

On April 12, 2018, staff intervened when F.C. made threats and began hitting walls and furniture.[71] The next day, she became physically aggressive when staff responded to an incident of head-banging.[72] She told staff "she want[ed] to attack everyone."[73] On April 16, F.C.

---

[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.* at 41251–52.
[67] *Id.* at 41254.
[68] *Id.* at 41238, 41240–41.
[69] *Id.* at 41204.
[70] *Id.* at 41188.
[71] *Id.* at 41178.
[72] *Id.* at 41167.
[73] *Id.*

threatened to harm nurses and eat non-edible items, shoved staff, and threw a drink "all over the team home."[74] The day after, she hit a wall and told her therapist that she was "going to start self[-]harming and not eating."[75] On April 18, F.C. grabbed a peer by the hair and staff had to intervene to prevent further aggression.[76] The next day, F.C.'s therapist noted "self-harm intention, suicidal ideation[,] . . . [and] physical aggression toward other students and staff."[77] On April 25, F.C. started hitting her head on the walls and biting and hitting staff.[78] Two days later, CALO recorded that F.C. "struggled for the majority of the night[,]" she "was not able to remain safe[,] got physical with staff and tried punching and kicking staff[,]" and she "tried multiple times to . . . try and harm herself."[79]

Between May 3 and May 15, 2018, F.C. had several thoughts of self-harm and tried to harm herself three times.[80] On May 20, F.C.'s therapist reported that F.C. had transitioned to team home.[81] During a June 3 medication management update, F.C.'s doctor relayed a therapist's report that F.C. had been "doing great in team home . . . [,] she is following expectations[,] and has been able to regulate her emotions."[82] The therapist confirmed in a June 6 note that F.C. was "doing GREAT" with no reports of self-harm in the preceding three weeks.[83] F.C. had an off-

---

[74] *Id.* at 41091.
[75] *Id.* at 41078, 41081.
[76] *Id.* at 41076.
[77] *Id.* at 41070.
[78] *Id.* at 41033.
[79] *Id.* at 41024–25.
[80] *Id.* at 40987 (May 3: ate half of a chew-toy and turned over another "self[-]harm object"), 40970 (May 5: found in shower with pants tied around her neck), 40952 (May 8: same), 40935 (May 12: thoughts of self-harm by food restriction), 40923 (May 14: thoughts of harming herself or others), 40919 (May 15: thoughts of self-harm).
[81] *Id.* at 40954–55; ECF No. 58-26, HCSC_LC_11843 (medication management report documenting a therapist's note).
[82] ECF No. 58-26, HCSC_LC_11842–43.
[83] *Id.* at 11828; *see id.* at 11818 (June 9 psychiatrist appointment).

campus visit with her family June 8–10.[84] On June 9, F.C. stated that she had not "had any harmful thoughts or suicidal thoughts and ha[d] not self[-]harmed in 3 weeks."[85] The next day, she informed staff that she had snorted a peer's prescription medication and ate a peanut that she had found in the bottom of a trash can.[86] When asked if she wanted to harm herself, others, or run away from the program in any way, F.C. said "Yes."[87] She had another off-campus visit with her parents from June 22 to June 26.[88]

F.C. visited home between July 14 and 18, 2018.[89] Five days after her return, F.C. tried to run away from CALO, she put pen ink in her eye, and she was banging her head against the floor "to try to hurt herself."[90] Staff gave her general first aid.[91] CALO noted that her "homicidal and [suicidal ideations] ha[d] recently emerged."[92] F.C. expressed that she had struggles with "feeling like Charles Manson and wanting to hurt" others.[93] She removed a three-and-a-half inch screw from the wall, hid it in her pants, and said that "she [wa]s extremely homicidal and wanted to take the screw she has and stab a peer in the neck causing fatal injury."[94] As a result, CALO sent her to a psychiatric hospital on July 25.[95] She was discharged five days later because the doctors found that she was not suffering from psychosis, schizophrenia, or dissociative identity disorder

---

[84] ECF No. 71-13, HCSC_LC_7510.
[85] ECF No. 58-26, HCSC_LC_11818.
[86] Id. at 11816.
[87] Id.
[88] ECF No. 71-13, HCSC_LC_7510.
[89] Id. Other than the record of off-campus and home visits, the court can find no treatment records between June 10, 2018, and July 22, 2018.
[90] ECF No. 47-16, HCSC_LC_8576–79.
[91] Id. at 8578.
[92] Id. at 8573.
[93] Id. at 8567.
[94] Id. at 8566.
[95] See id. at 8563; ECF No. 47-2, HCSC_LC_8.

and her homicidal ideations had marginally reduced.[96] Doctors discouraged F.C. from watching "anything related to serial killers or murder" because she was "somewhat a chameleon taking on the persona of those around her."[97]

At a group therapy session on July 30, 2018, CALO reported that "[F.C.] was present and engaged[,] . . . [s]he contributed[,] and was receptive to the input of others."[98] That night, staff had to physically intervene due to F.C.'s threats to peers, screaming, intimidation, posturing, destroying property, punching walls, and shoving.[99] The next day, she displayed more disruptive behavior: profanity, posturing, property destruction (ripping a door frame), punching walls or objects, and talking about self-harm.[100] She also confessed thoughts of harming others "all the time" by acting out and threatening to stab or choke others at the request of "charles."[101]

On August 1, 2018, F.C. threatened peers, screamed, intimidated others, used profanity, and was posturing, hitting, and hair pulling.[102] Staff physically intervened.[103] CALO noted her use of profanity and her posturing the following day.[104] On August 3, the therapist recorded that F.C. was refusing therapy "most likely due to feeling[] shameful."[105] On August 4, she punched a wall and used profanity.[106] The next day, staff restrained F.C. after she punched a wall and pulled hair.[107] On August 6, staff intervened when F.C. threatened staff, destroyed property, punched a

---

[96] ECF No. 47-16, HCSC_LC_8544–45.
[97] *Id.* at 8545.
[98] *Id.* at 8543.
[99] *Id.* at 8539, 8541.
[100] *Id.* at 8537.
[101] *Id.* at 8535.
[102] ECF No. 71-17, HCSC_LC_8078.
[103] *Id.* at 8077.
[104] *Id.* at 8074.
[105] *Id.* at 8071.
[106] *Id.* at 8067.
[107] *Id.* at 8065.

wall, and was shoving and biting.[108] The following day, F.C. suddenly tried to "go[] after one of her peers."[109] After staff calmed her down, she "began rocking back and forth and yelling at 'Patricia[,]' one of the 'voices' inside of her head."[110] She started screaming, punching herself in the head, and trying to pull out her hair. After the incident, F.C. said that she "want[ed] to hurt others, better yet . . . to kill" and that she needed to kill her peers, "especially the younger ones," to remain safe.[111] F.C. discussed the event with staff. "[F.C.] came up with instead of answering the voices in her head . . . that she could answer them out loud to staff so that staff could talk to not only the 'voices,' but so [she] can hear staff and know that they are real and keeping her safe."[112] She "moved to bed with no further issues and seemed to be in a much better spot."[113]

On August 8, 2018, staff reported no incidents other than a refusal to shower.[114] On August 9 and 10, staff recorded only the use of profanity.[115] F.C.'s therapist noted that her "homicidal ideation ha[d] reduced some, although, she states that she is still hearing voices that tell her to hurt other[s]."[116] Her doctor noted during an August 11 medication management review that F.C. had said she was doing better but "voices in her head were telling her to choke someone or hit some one [sic] . . . . [She] denie[d] having any [suicidal ideations] but report[ed] that she still has [homicidal ideations] but not against any particular person . . . . [She] denie[d] having any manic, psychosis, [OCD], [PTSD], or eating disorder symptoms."[117]

---

[108] *Id.* at 8051.
[109] *Id.* at 8045.
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.*
[114] *Id.* at 8041.
[115] *Id.* at 8039; ECF No. 71-18, HCSC_LC_8123, 8125.
[116] ECF No. 71-18, HCSC_LC_8124.
[117] *Id.* at 8119.

On August 12, 2018, staff recorded that F.C. refused to eat.[118] During an August 13 group therapy session, one student started yelling at staff, which made F.C. upset and caused her to punch a wall.[119] When staff intervened, she "was very receptive to coaching and moved to a better spot afterwards."[120] That same day, F.C. participated in a group therapy session where she "contributed and was receptive to the input of others."[121] She was also "coherent and goal directed" during an individual therapy session on August 13.[122] The therapist described F.C.'s "struggle[es] with gaining negative attention with spitting up saliva and seeking negative attention from nursing."[123] Between August 14 and 18, the only recorded negative behavior was a use of profanity and a refusal to eat on one occasion.[124]

**CALO from August 19, 2018, to January 15, 2020**

F.C. remained at CALO until her discharge on January 15, 2020. On August 19, 2018, staff noted that she was punching walls and using profanity.[125] There were no recorded disruptions for August 20 except for profanity.[126] At a medication management review the same day, a doctor noted that F.C. was transitioning to a different team home, was feeling better, was not hearing any voices, did not have any homicidal thoughts toward specific persons, had a

---

[118] *Id.* at 8115.
[119] *Id.* at 8104.
[120] *Id.*
[121] *Id.* at 8109.
[122] *Id.* at 8107.
[123] *Id.*
[124] *Id.* at 8090, 8093, 8095–96, 8100, 8103 (profanity use August 14–18); ECF No. 71-35, HCSC_LC_21382 (refusal to eat August 18).
[125] ECF No. 71-18, HCSC_LC_8088.
[126] *See id.* at 8085–86; ECF No. 71-19, HCSC_LC_8176.

relatively stable mood, and denied any "manic, psychosis, [OCD], [PTSD] or eating disorder symptoms."[127] CALO recorded no disruptive behavior on August 21.[128]

During an August 22, 2018 session, the therapist observed that F.C. seemed to feel comfortable, stayed awake and focused, and "fe[lt] like her self[-]worth, self-harm, and feelings of despair [went] down in the past week."[129] Starting August 23 and continuing through September 24, there were no reported suicidal ideations, suicide attempts, suicidal gestures, or physical incidents like punching walls or attacking others.[130] Disruptive behavior during this period included occasional refusals to eat, wakeup on time, or take a shower; bullying and intimidating others; and the use of profanity.[131] She had an off-campus visit with her family over Labor Day weekend.[132] On her return, F.C.'s therapist described how she "was able to self-regulate very quickly with no complications."[133] On September 25, staff intervened with F.C. for head-butting, profanity and yelling.[134] A September 30 progress report noted that in addition to the incident of head-butting, she had only one instance of "homicidal ideation that she did not act upon but sought out and advocated for help."[135]

---

[127] ECF No. 71-19, HCSC_LC_8179.
[128] *Id.* at 8174.
[129] *Id.* at 8173.
[130] *See* ECF No. 71-35, HCSC_LC_21392–410 (records August 20 to September 4); ECF No. 71-36, HCSC_LC_21411–50 (records September 4 to September 25).
[131] *See* ECF No. 71-35, HCSC_LC_21393 (profanity August 23), 21395 (refusal to shower or wake up on time August 25), 21397 (refusal to eat or shower August 26), 21400 (profanity August 27), 21402 (refusal to shower August 28), 21403 (refusal to shower August 29), 21405 (profanity August 30), 21407 (profanity August 31), 21409 (bullying and intimidating others on September 3); ECF No. 71-36, HCSC_LC_21411 (profanity September 4), 21412 (profanity and difficulty waking up September 5), 21414 (difficulty walking up September 6), 21415, 21417, 21420–21, 21423, 21427, 21429, 21431, 21433, 21435, 21437, 21439, 21443–48 (profanity September 6–10, 12–18, 20–23).
[132] ECF No. 58-15, HCSC_LC_6569.
[133] ECF No. 71-20, HCSC_LC_8227.
[134] ECF No. 71-36, HCSC_LC_21451.
[135] ECF No. 71-16, HCSC_LC_7963–64.

On October 2, 2018, F.C. picked at a thigh injury and needed first-aid.[136] Staff noted that she was able to process the incident and express to staff that she no longer felt the need to hurt herself.[137] She had an incident of head-butting on October 21.[138] CALO stated at the end of October that F.C. "has done very well with emotional regulation and not reverting to unsafe behaviors, . . . continues to participate in scheduled activities[,] . . . has been able to express more safe thoughts as well[,] . . . [and has] completed her [studies] and is getting up in the morning on time."[139] On November 3, staff intervened with F.C. for "physical aggression and self[-]harm."[140] A week later, CALO reported that F.C. harmed herself and was given "general first aid[.]"[141] Throughout October and November, she refused to eat on three occasions and sometimes self-isolated.[142] She reported that home visits in October and November went well.[143]

CALO's November 2018 treatment review indicated that F.C. had "struggles with an unhealthy sense of self[,] resulting in the inability to recognize her own negative and harmful thoughts as her own[.]"[144] Still, CALO noted that she had "made improvement in this area and rarely talks about hearing voices; when she does talk about the 'voices' she refers to them as her own self-talk."[145] The review also indicated that F.C. "struggle[d] to take responsibility for her own thoughts and actions" and "struggled to show compassion for others."[146] Staff wrote that F.C. "has improved greatly in her struggle[s] to . . . self-regulate when held accountable or

---

[136] ECF No. 71-37, HCSC_LC_21464.
[137] ECF No. 71-27, HCSC_LC_9426.
[138] ECF No. 61-13, HCSC_LC_21493.
[139] ECF No. 71-16, HCSC_LC_7966.
[140] ECF No. 58-16, HCSC_LC_7084.
[141] ECF No. 61-13, HCSC_LC_21515. F.C. did not require an emergency safety physical intervention.
[142] *See* ECF No. 71-37, HCSC_LC_21464–512; ECF No. 61-13, HCSC_LC_21513–27.
[143] ECF No. 47-20, HCSC_LC_10625, 11058; *see* ECF No. 58-15, HCSC_LC_6569.
[144] ECF No. 71-25, HCSC_LC_9362.
[145] *Id.*
[146] *Id.*

feeling strong emotion of failure, disappointment in expectations of others or shame evidenced by projective identification onto others the shame she is feeling."[147] Last, staff said that F.C. "has improved in her struggle to show a consistent ability during this review period to show safe behavior toward others."[148] CALO and F.C.'s parents cancelled the planned January 2019 transition home.[149]

Between December 5 and 15, 2018, CALO noted F.C.'s use of profanity on seven days.[150] Staff physically intervened several times: December 7 for head-butting and property destruction;[151] December 8 for posturing, hitting, property destruction, punching walls, shoving, and threatening and bullying staff;[152] December 9 for posturing, hitting, scratching, and threatening staff;[153] and December 10 for posturing, hitting, and punching walls.[154] In a December 11 session, the therapist wrote that F.C. "was able to communicate that she needed to talk to staff more when frustrated or anger [sic], given [sic] her parents the chance to tell her why the transition [home] was postponed, [and] that she was feeling self[-]doubt and anger in her self-reflection."[155] F.C. visited her home for ten days over the holidays.[156] The therapist reported that she had a "great home visit" and was "stoked at her progress,"[157] though the therapist noted

---

[147] *Id.*
[148] *Id.*
[149] ECF No. 71-22, HCSC_LC_8514 (finding that F.C. "needed improvement . . . toward establishment of trust, reciprocity, emotional safety, vulnerability, repair, unpredictability, self-centeredness and catastrophizing when unhappy").
[150] ECF No. 61-13, HCSC_LC_21544 (December 5), 21546 (December 7), 21548 (December 8), 21551 (December 9), 21553 (December 10), 21556 (December 12); ECF No. 61-14, HCSC_LC_21561 (December 15).
[151] ECF No. 61-13, HCSC_LC_21546.
[152] *Id.* at 21548.
[153] *Id.* at 21550–51.
[154] *Id.* at 21553.
[155] ECF No. 71-24, HCSC_LC_9049.
[156] *See* ECF No. 47-20, HCSC_LC_10859.
[157] *Id.*

17

some manipulation.[158] CALO wanted "to be confident that the progress and changes she has made are for the long term" and that F.C. will be able to "manage going home full time."[159] The therapist recommended a transition out of CALO in May 2019.[160]

Staff took away Midas, F.C.'s assigned canine therapy dog,[161] at some point between February 11 and February 16, 2019 "due to [F.C.] not caring [or] following through with her commitments to [Midas] and the K-9 program."[162] As CALO stated, "[l]osing Midas was a huge loss[,]" and F.C. thought another girl in her group home was going to get Midas.[163] F.C. tried to run away during a six-day home visit in mid-February.[164]

On March 4, 2019, she saw a piece of metal in the gym and said she wanted to slit a peer's throat.[165] Four days later, staff entered a bathroom after hearing F.C. crying. Staff observed her laying on the floor outside of the shower. There was a "big hunk of hair in the shower" and she "handed over a shoe string that [she] tried to use to hurt herself."[166] During a March 9 safety assessment, F.C. said that she "plans to jump off the balcony or throw someone off the balcony."[167] CALO noted F.C.'s refusal to eat and perform self-hygiene on March 12.[168]

---

[158] *Id.*
[159] *Id.*
[160] ECF No. 71-9, HCSC_LC_5515.
[161] F.C. applied in May 2018 for the canine integration program. This program would allow her to interact with and care for a canine during her stay at CALO. *See* ECF No. 71-8, HCSC_LC_4821–34. Staff approved her application. *Id.* at 4835–39.
[162] ECF No. 71-6, HCSC_LC_4390. On February 11, 2019, F.C. spent time with Midas. ECF No. 58-9, HCSC_LC_4695. But she did not take Midas home during her February 16–23 visit "as the dog had been returned [because] she was not taking care of him." ECF No. 47-20, HCSC_LC_10181; *see* ECF No. 58-15, HCSC_LC_6569. While it is unclear exactly when CALO removed F.C.'s access to Midas, it is reasonable to conclude that it happened between February 11 and 16, 2019.
[163] ECF No. 71-30, HCSC_LC_15752.
[164] ECF No. 58-15, HCSC_LC_6569.
[165] ECF No. 71-32, HCSC_LC_16042.
[166] *Id.* at 16026.
[167] *Id.* at 16020.
[168] *Id.* at 16003.

On March 14, the therapist documented F.C.'s recent suicidal gestures and homicidal statements as her "struggle to feel in control of her environment after the loss of her [therapy] canine . . . and an unsuccessful home visit of recent."[169] Additionally, the therapist noted her issues with lying and malingering.[170] She expressed "concern[] for [F.C.]'s future if we do not make significant progress in the next few months and that her borderline characteristics will grow to full potential if we are unable to temper it by the time she is 18."[171]

On March 15, F.C. stuck a wood splinter into one of her sores and needed nursing care.[172] She also set off a fire extinguisher.[173] CALO's therapist noted that F.C. "reported ideation's [sic] of suicide/homicide in an effort to relieve her own pain/inflict pain on others so she is not alone in her pain."[174] Staff said that she had "[n]o specific plan for either suicide or homicide," that she was engaging in manipulation, and that she had not been truthful.[175] On March 26, F.C. walked out of a family therapy session, claimed that she had a "self[-]harm object" in the team home to "manipulat[e] her therapist to . . . transition[,]" and tried to hit her head on the floor and wall and to injure her knee.[176] Staff calmed her down.[177]

Staff intervened on April 6, 2019 for an incident of head-butting.[178] On April 8 and 9, F.C. self-isolated; refused to eat; used profanity; bullied peers; physically attacked and threatened others by posturing, hitting, kicking, biting, and head-butting; self-harmed to the point of

---

[169] ECF No. 71-6, HCSC_LC_4390.
[170] *Id.*
[171] *Id.*
[172] ECF No. 71-32, HCSC_LC_16077.
[173] *Id.*
[174] *Id.*
[175] *Id.*
[176] *Id.* at 16110.
[177] *Id.*
[178] ECF No. 71-30, HCSC_LC_15745.

requiring general first aid; and expressed a suicidal ideation.[179] Staff intervened to prevent

further harm.[180] F.C. said: "I want to hurt someone. I feel like I'm going to blow and hurt anyone

I can. I don't want to hurt anyone but I also don't care if I hurt someone."[181] The therapist

expanded on F.C.'s emotions: She "has described feelings of anger and being overwhelmed over

the past 5 days . . . . [She] continues to be non-compliant with meds, yet was compliant with

processing and safety plan creation . . . . [She] reports that she had the thought to slit someone's

throat or attack another person within the team home today."[182] F.C. agreed to "continue to

utilize closeness" with staff and "was aware that she has the opportunity to avoid a hospital stay

through utilization of closeness and that her recent unchecked trajectory is likely to lead her to a

hospital stay."[183] On April 21, staff intervened when she tried to run away.[184] However, "[o]nce

back in the team home she was able to process with staff and she did make repairs with her

peers. She was able to move through the rest of the evening with no issues."[185]

CALO canceled an April 30–May 1, 2019 home visit due to F.C.'s dysregulation.[186] On

May 5, F.C. "struggled . . . with flash back's [sic] of her past and thoughts in her head that her

peers were going to attack her."[187] Staff intervened when she started hitting her head against the

floor and the wall.[188] In a late-May treatment update, CALO noted that F.C. was "cooperative in

her team home with little dysregulation" and "cooperative in individual and family therapy."[189]

---

[179] *Id.* at 15721–22, 15729, 15731, 15734.
[180] *Id.* at 15718.
[181] *Id.* at 15729.
[182] *Id.* at 15727–28.
[183] *Id.* at 15728.
[184] *Id.* at 15763.
[185] *Id.*
[186] ECF No. 71-12, HCSC_LC_6960.
[187] ECF No. 71-31, HCSC_LC_15859.
[188] *Id.*
[189] ECF No. 71-14, HCSC_LC_7534.

The therapist indicated her "significant progress to choose healthy language to communicate her frustration rather than using profanity, harming herself[,] or reporting homicidal ideations[.]"[190] She further stated that F.C. "exhibited more healthy relations while interacting with peers and staff."[191] F.C. successfully completed a home visit June 21–23.[192]

On August 12, 2019, a physician noted during a medication management update that F.C. was "doing very well and ha[d] made many strides in her treatment."[193] Her therapist echoed the sentiment on August 20.[194] CALO noted at the end of August that she had "made significant progress to self[-] and co[-]regulate when feeling upset" and had "demonstrated the ability to self[-] and co[-]regulate to calm herself and utilize her rational facilities."[195] She had a home visit from August 31 to September 3.[196] On her return, she "agreed to work on manipulation, impulsiveness and forgiveness" as well as acceptance.[197] Two weeks later, she reported that she had been able to "work on 'bumps in the road' and successfully recover with her parents."[198] Her parents said that they "are seeing a more 'balanced mature young lady.'"[199]

No significant events occurred until late October 2019. On October 24, while waiting for the restroom to become available, F.C. became upset and started banging her head on the wall.[200]

---

[190] Id.
[191] Id.
[192] ECF No. 71-12, HCSC_LC_6960.
[193] ECF No. 71-15, HCSC_LC_7714.
[194] ECF No. 47-9, HCSC_LC_7365 ("[F.C.] has made much progress with [rapid changes in mood] and is working on a coherent and goal[-]directed thought process to reason on her own without utilizing manipulation, displacement and projection.").
[195] ECF No. 71-13, HCSC_LC_7510.
[196] Id.
[197] ECF No. 47-10, HCSC_LC_7393.
[198] ECF No. 71-13, HCSC_LC_7495.
[199] ECF No. 47-10, HCSC_LC_7393.
[200] ECF No. 58-16, HCSC_LC_7032.

She expressed that she "felt very impulsive and didn't know how to respond in that moment."[201] The therapist explained that F.C. had made "long strides in her ability to communicate and be less reactive to unpleasant thoughts, feelings and experiences," that she needed further work dealing with her sexual assault, and that she was "able to verbalize understanding and insight into herself."[202] On October 30, F.C. became upset after a family therapy session and tried to bang her head against the wall.[203] Staff was able to "redirect her and . . . and get [her] to process."[204] F.C. refused to eat and used profanity on November 13.[205] Six days later, staff found her "banging her head on the floor or wall" and so they had her sit upright.[206] F.C. visited home from November 21 until December 3.[207]

On December 12, 2019, CALO's therapist recorded that F.C. had a hopeless and depressed emotional state and struggled with goal direction, but found that she was coherent and that she had fair judgment.[208] On December 15, staff observed F.C. purging in the team home and noted that she had not been eating at meal times.[209] She walked out of a family therapy session on December 17 and hit her head on the ground.[210] Her doctor said two days later that she was not purging, that she was medication compliant, and that she was "happy and also nervous about the transition" home the following month.[211] Her December 2019 treatment summary noted that

---

[201] *Id.*
[202] *Id.* at 7042. F.C. said that she had been sexually assaulted in November 2016. ECF No. 47-7, HCSC_LC_4885; ECF No. 47-8, HCSC_LC_7295.
[203] ECF No. 58-16, HCSC_LC_7112.
[204] *Id.*
[205] *Id.* at 7134.
[206] *Id.* at 7204.
[207] ECF No. 58-15, HCSC_LC_6569.
[208] *See* ECF No. 58-16, HCSC_LC_6787.
[209] ECF No. 71-11, HCSC_LC_6872.
[210] ECF No. 47-2, HCSC_LC_9.
[211] ECF No. 71-11, HCSC_LC_6836–37.

she required only one physical assist for banging her head and she "was able to demonstrate[] the ability to self[-] and co[-]regulate 90% of the time" when disappointed or upset.[212]

**Discharge from CALO**

F.C. left CALO on January 15, 2020.[213] CALO recommended "outpatient individual psychotherapy, family therapy, and psychiatric care to manage medications."[214] It also stated that due to having "on-going symptoms/behaviors 10% of the time," F.C. would need continued work in therapy for "[s]truggles with verbal and physical passive aggression toward herself and others" and "[s]truggles with thoughts of harming self and a mended sense of self, as evidenced by, co-dependency, indecision, manipulation, triangulation[,] and harmful life choices in relationships."[215] CALO gave the following reasons for her discharge:

> [She] has been successful in her treatment . . . . She is ready to transition home . . . . She has shown Commitment, Acceptance, Security, and Attunement . . . as evidenced by, working authentically in her treatment at Calo and experientially showing her growth and healing, as evidenced by, less dysregulation and virtually no self[-]harm. [She] is able to function with the aid of outpatient treatment and remain regulated *the majority of the time* without harmful behavior.[216]

CALO also noted that F.C. had "progressed in therapy as evidenced by a significant reduction in the severity, intensity, and frequency of behaviors that necessitated residential care" and was now "able to self-regulate when she becomes upset and integrate reason with emotions."[217] Finally, CALO recommended "[i]ndividual, [f]amily, and [g]roup therapy . . . . Structured living and structured small school environment are optimal . . . and is recommended.

---

[212] ECF No. 71-12, HCSC_LC_6960.
[213] ECF No. 58-15, HCSC_LC_6558.
[214] *Id.* at 6961.
[215] *Id.*
[216] *Id.* at 6996 (emphasis added).
[217] *Id.*

Ongoing parental support is recommended to deal with the challenges of managing [her] emotions, impulse, urges and unhealthy behaviors."[218]

**Denial of Benefits after August 18, 2018**

Blue Cross authorized coverage at CALO from January 22, 2018, to August 18, 2018.[219] It authorized coverage because F.C. "was in imminent harm to herself as evidenced by multiple suicide attempts, suicidal ideation and self-harming behavior."[220] Additionally, it found that F.C. "was in imminent harm to others as evidenced by aggressive behavior toward others requiring multiple hold[s]/restraint[s]."[221] It also authorized two short periods of inpatient hospitalization in March and July 2018.[222]

Blue Cross denied coverage after August 18, 2018. In an August 22 letter, Blue Cross acknowledged that "[a]ll information related to your request was received and reviewed by a Medical Director."[223] The letter explained:

> Based on the information provided, you do not meet MCG care guidelines Major Depressive Disorder: Residential Care . . . for the following reasons: You are not a danger to yourself. You are not a danger to others. You have supportive family. You are medically stable. You are tolerating medications. You could be treated at a partial hospital program. From the information provided, you can be safely treated in a different setting such as Mental Health Partial Hospital/Day Treatment . . . . The criteria used in making the adverse determination was MCG. The specialty of the Medical Director that made the adverse determination was Psychiatry.[224]

---

[218] ECF No. 58-15, HCSC_LC_6560.
[219] *See* ECF No. 47-1, HCSC_LC_2–3. In an August 21, 2019 letter, Blue Cross denied treatment from May 21, 2018 until July 25, 2018. *See* ECF No. 47-4, HCSC_LC_215–17. On appeal, Blue Cross overturned its denial because F.C. had met MCG RTC: "You were physically aggressive. You made attempts to harm yourself. You had thoughts to harm yourself and others. You had running away behaviors. ECF No. 47-23, HCSC_LC_23154.
[220] ECF No. 47-1, HCSC_LC_3.
[221] *Id.*
[222] *See* ECF No. 47-2, HCSC_LC_8.
[223] ECF No. 47-19, HCSC_LC_9717.
[224] *Id.* The court refers to the letter of August 22, 2019 as the first denial letter.

Plaintiffs appealed. They argued that Blue Cross was wrong to deny F.C. coverage because her behavioral issues required "long-term, intensive treatment" at CALO.[225] Plaintiffs cited CALO medical records to try to "contradict the claims made in [Blue Cross's] denial and show that her treatment was not only effective, but also life-changing."[226] They also claimed that Blue Cross violated the Parity Act because "[t]he requirement that patients must exhibit acute symptomology in order to qualify for subacute treatment as has been proposed by [Blue Cross] seems to be an attempt to impose a nonquantitative treatment limitation."[227]

On June 30, 2020, Blue Cross denied Plaintiffs' appeal after review by a board-certified doctor who specialized in psychiatry:[228]

> Based on the information provided, you did not meet MCG Care Guidelines Residential Acute Behavioral Health Level of Care (Child/Adolescent) Guidelines . . . for the following reasons: You were cooperative with treatment. Your mental health symptoms had improved. You had developed healthy coping skills. Your family was supportive. You went home to visit your family often. Your functioning was good. At times you had thoughts to harm yourself and others, but these were passive thought[s]. You did not appear to be imminently dangerous. At times you had mild attempts to harm yourself, but these behaviors were not severe and could have been managed at a lower level of care. You had no severe aggression toward others. You had no severe psychosis. You had no severe medical issues. From the information provided, you could have been safely treated in a different setting such as Mental Health Partial Hospital/Day Treatment.[229]

After exhausting their administrative remedies, Plaintiffs sought judicial review.

---

[225] ECF No. 47-8, HCSC_LC_7301.
[226] *Id.*
[227] *Id.* at 7288.
[228] ECF No. 47-24, HCSC_LC_35278. The court refers to the June 30, 2020 letter as the second denial letter.
[229] *Id.* at 35279.

**Procedural Posture**

Plaintiffs filed their Complaint on May 21, 2021.[230] After discovery, Blue Cross filed its Motion for Summary Judgment on August 30, 2022.[231] Plaintiffs filed their Motion for Summary Judgment the same day.[232] The parties filed their oppositions on October 26, 2022,[233] and filed replies on November 23, 2022.[234]

STANDARD

Generally, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[235] "Where, as here, the parties in an ERISA case both moved for summary judgment . . . , summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[236]

DISCUSSION

The parties move for summary judgment on two issues: Blue Cross's denial of benefits at CALO and Plaintiffs' Parity Act claim. The court addresses each issue in order.

## I. The Record Supported the Decision to Deny Coverage after August 18, 2018.

Plaintiffs' first cause of action is a claim for benefits under 29 U.S.C. § 1132(a)(1)(b). They contend that residential care was necessary from August 19, 2018, to January 15, 2020.

---

[230] *See* Compl.
[231] *See* Def. MSJ.
[232] *See* Pl. MSJ.
[233] *See* Def. Opp'n to Pl. Mot. for Summ. J. ("Def. Opp'n"), ECF No. 75, filed Oct. 26, 2022; Opp'n to Def. Mot. for Summ. J. ("Pl. Opp'n"), ECF No. 77, filed Oct. 26, 2022.
[234] *See* Def. Reply in Support of Its Mot. for Summ. J. ("Def. Reply"), ECF No. 85, filed Nov. 23, 2022; Reply in Support of Pls. Mot. for Summ. J. ("Pl. Reply"), ECF No. 86, filed Nov. 23, 2022.
[235] Fed. R. Civ. P. 56(a).
[236] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1221 (10th Cir. 2021) (cleaned up).

The parties agree that a de novo review is proper.[237] "When applying a de novo standard in the ERISA context, the role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision. The administrator's decision is accorded no deference or presumption of correctness,"[238] and the court "will consider only those rationales that were specifically articulated in the administrative record as the basis for denying a claim."[239] The court "limits . . . review to the record before [Blue Cross] at the time it made its decision."[240] "The *de novo* standard is not whether substantial evidence or some evidence supported the administrator's decision"; "[r]ather, it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the . . . court's independent review."[241]

In this case, determining whether residential care was necessary "due to adequate patient stabilization or improvement" under Blue Cross's MCG RTC requires the court to focus on a member's (a) risk status, (b) functional status, and (c) medical needs.[242]

## A.    Risk Status

Under the first set of criteria—risk status— ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[237] *See* Pl. MSJ 24–28; Def. Opp'n 15 n.5.

[238] *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (unpublished) (quoting *Hoover v. Provident Life and Accident Ins.*, 290 F.3d 801, 808–09 (6th Cir. 2002)).

[239] *Spradley v. Owens–Ill. Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012).

[240] *Gielissen v. Reliance Standard Life Ins.*, No. 21-1377, 2022 WL 5303482, at *4 (10th Cir. Oct. 7, 2022) (citing *Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1202 (10th Cir. 2002)).

[241] *Jonathan Z. v. Oxford Health Plans*, No. 2:18-cv-00383, 2022 WL 2528362, at *12 (D. Utah July 7, 2022).

[242] *See* ECF No. 47-18, HCSC_LC_9698–99; ECF No. 47-22, HCSC_LC_23090–91. The court reviews F.C.'s CALO records since the reviewers considered everything provided in the June 2020 appeal, which included the treatment records. *See* ECF No. 47-8, HCSC_LC 7301; ECF No. 47-24, HCSC_LC_35278.

████████████████████████████████████████████████████████

████████████████████████████████████ [243]

In the first denial letter, Blue Cross stated: "You are not a danger to yourself. You are not a danger to others. You have supportive family."[244] The second letter expanded on the reasoning:

> At times you had thoughts to harm yourself and others, but these were passive thought[s]. You did not appear to be imminently dangerous. At times you had mild attempts to harm yourself, but these behaviors were not severe and could have been managed at a lower level of care. You had no severe aggression toward others.[245]

Plaintiffs cite fifty-nine incidents between August 4, 2018 and December 19, 2018 that purportedly show that F.C. was "non-functional or unsafe."[246] These included some incidents of physical aggression, homicidal ideations, self-harm, times where F.C. dealt with food restriction or purging, and suicidal ideations and gestures.[247] Plaintiffs contend that these incidents are "merely the days it was most evident [F.C.] was struggling."[248] They also state that F.C. had home passes cancelled and visits cut short due to dysregulation.[249] Finally, Plaintiffs argue that Blue Cross could not support its decision to deny treatment because "there [wa]s simply no principled basis on the record for [Blue Cross] to conclude that on August 18, 2018, F.C. was better than she was a few weeks prior to that or that she would be better a few weeks after."[250]

Blue Cross argues that as of August 18, 2018, F.C. no longer needed 24-hour care because her symptoms had improved.[251] In support, Blue Cross cites F.C.'s successful home

---

[243] ECF No. 47-18, HCSC_LC_9698–99.
[244] ECF No. 47-19, HCSC_LC_9717.
[245] ECF No. 47-24, HCSC_LC_35279.
[246] Pl. MSJ 28.
[247] Pl. MSJ 28–29.
[248] Pl. MSJ 29.
[249] *Id.*
[250] Pl. MSJ 30 (citing *Charles W. v. Regence BlueCross BlueShield of Or.*, No. 2:17-cv-00824, 2019 WL 4736932, at *10 (D. Utah Sept. 27, 2019), *order clarified*, 2020 WL 1812372 (D. Utah Apr. 9, 2020)).
[251] Def. MSJ 18–19.

visits and the fact that CALO had removed safety precautions in August 2018.[252] It also asserts that in August, F.C. denied homicidal or suicidal thoughts and had not made any suicidal gestures.[253] It contends that F.C. continued to show improvement from August 19, 2018, to January 15, 2020, when she was able to manage her behaviors and symptoms, process her feelings, seek help, and enjoy home visits.[254] Blue Cross states that it had "not cut[] F.C. off from additional mental health care" after August 18, 2018 since F.C. "could have safely and effectively received up to 8 hours of care per day in a PHP."[255]

In addition to the parties' briefs, the court has studied the record evidence as part of its de novo review. Both parties agree, and the court concurs, that F.C. required the 24-hour treatment provided by an RTC when F.C. first was admitted to CALO in January 2018. Shortly after her admittance to CALO, staff had to intervene when F.C. intentionally ingested a peanut despite having a peanut allergy.[256] From February 1 until March 8, 2018, F.C. repeatedly expressed a desire to harm herself.[257] And she made suicidal gestures or attempted suicide.[258]

On March 10, F.C. was admitted to a hospital after refusing to eat or drink for four consecutive days.[259] Throughout March, staff had to intervene when F.C. tried to jump off of the top bunk in her room and when she tied a pair of jeans around her neck.[260] In April, F.C. continued to have repeated suicidal thoughts, she inflicted self-harm, and she was physically

---

[252] *See id.* at 20–21.
[253] *See* Def. Opp'n 17.
[254] *Id.*; Def. Reply 5.
[255] Def. MSJ 23.
[256] ECF No. 47-7, HCSC_LC_4871–72, 4876–77.
[257] ECF No. 47-6, HCSC_LC_4724 (answering that she had suicidal thoughts "[a]ll the time"); ECF No. 47-26, HCSC_LC_43890 (observing F.C. hanging from a shower curtain with a pair of jeans around her neck).
[258] ECF No. 47-6, HCSC_LC_4724; ECF No. 47-26, HCSC_LC_43890.
[259] ECF No. 47-17, HCSC_LC_9297–98.
[260] ECF No. 47-6, HCSC_LC_4746, 4748, 4729, 4752, 4763.

aggressive toward staff and other students.[261] In May, staff found her with clothing wrapped around her neck on two other occasions and F.C. had several thoughts of self-harm.[262]

F.C. had an off-campus visit in June.[263] But on June 10, she snorted a peer's prescription medicine and ingested a peanut despite her allergy.[264] She said that she wanted to harm herself or others or to run away.[265] After returning from a home visit, F.C. tried to run away on July 23.[266] The next day, F.C. had severe homicidal and suicidal ideations and tried to harm herself.[267] She hid a three-and-a-half inch screw and told staff that she felt like Charles Manson and wanted to fatally stab a peer in the neck.[268] As a result, CALO sent her to an inpatient psychiatric ward.[269] For nine days after her discharge, CALO recorded almost daily incidents, some of which were significant. She threatened and attacked peers, had thoughts about seriously hurting others, harmed herself, and said she heard a voice inside her head.[270]

From August 7 to August 18, 2018, however, F.C. demonstrated a marked improvement. There was one wall-punching incident and two refusals to eat during this period.[271] But F.C. did

---

[261] ECF No. 62-32, HCSC_LC_41024–25, 41033, 41070, 41076, 41078, 41081, 41091, 41167, 41178, 41188, 41204, 41238, 41240–41, 41251–52, 41254.
[262] Id. at 40919, 40923, 40935, 40952, 40970, 40987.
[263] ECF No. 71-13, HCSC_LC_7510.
[264] ECF No. 58-26, HCSC_LC_11816.
[265] Id.
[266] ECF No. 71-13, HCSC_LC_7510; ECF No. 47-16, HCSC_LC_8575.
[267] Id. at 8573, 8576–79.
[268] Id. at 8564, 8566.
[269] Id. at 8563, 8566–67.
[270] ECF No. 47-16, HCSC_LC_8539, 8541, 8544–45 (July 30: posturing, punching walls, shoving, threatening and intimidating peers, and screaming), 8535, 8537 (July 31: damage to a door frame, posturing, punching walls, homicidal ideations); ECF No. 71-17, HCSC_LC_8077–78 (August 1: physical aggression, threatening and intimidating others, screaming, posturing, hitting, hair pulling, and property destruction), 8074 (August 2: posturing and profanity), 8067 (August 4: punching walls), 8065 (August 5: punching walls and hair pulling), 8049, 8051 (August 6: physical aggression, property destruction, punching walls, biting, shoving, and threatening staff), 8045 (August 7: attacking a peer and hearing voices).
[271] ECF No. 71-17, HCSC_LC_8039; ECF No. 71-18, HCSC_LC_8104, 8123–24, 8125. Plaintiffs note that F.C. used profanity many times during her stay, including during this time period. But there is no explanation about why such a common behavior would require 24-hour residential treatment.

not exhibit the severe behaviors that were prevalent in the preceding weeks or months. On August 10, she told her therapist that she had been hearing voices telling her to hurt others.[272] Still, the ideations were general in nature and she did not act on them.[273] F.C. then appeared to have followed her own idea to verbalize the voices to staff, another improvement.[274] Though the therapist recommended continued "closeness" for "[a]ll forms of safety,"[275] she noted no recent incidents of self-harm or harm to others.[276] The therapist documented only the following: verbal aggression;[277] symptoms of fatigue and anxiety; and a report of dysregulation in a family therapy session after discovering that her parents had planned to cut one day from her October home visit.[278] What is more, F.C. was receptive to coaching.[279] By mid-August, F.C. was actively participating in several types of therapy[280] and was able to self-resolve some instances of aggression without staff intervention.[281]

F.C.'s positive trend continued for the five weeks after August 18, 2018. Other than one incident on August 19 for punching a wall and using profanity, CALO reported no other disruptive behaviors except for profanity.[282] On August 20 and 22, F.C.'s providers noted her

---

[272] ECF No. 71-18, HCSC_LC_8124.
[273] *Id.* at 8119.
[274] *See* ECF No. 71-17, HCSC_LC_8045.
[275] ECF No. 71-18, HCSC_LC_8119. F.C.'s therapist also said that she required closeness "[e]veryday." *Id.* The record does not support this claim. *See, e.g., id.* at 8092, 8095–96, 8100, 8103 (no closeness required August 14–18, 2018).
[276] Despite F.C.'s therapist reporting daily physical interventions, the daily milieus and summaries for that week reported "**zero** incidents requiring emergency safety physical intervention." *E.g.*, ECF No. 71-18, HCSC_LC_8090.
[277] CALO referred to the use of profanity as "verbal aggression." *See, e.g.*, ECF No. 71-36, HCSC_LC_21446.
[278] ECF No. 71-18, HCSC_LC_8091.
[279] *Id.* at 8104.
[280] *See* ECF No. 47-2, HCSC_LC_14; ECF No. 71-18, HCSC_LC_8083, 8091, 8086; ECF No. 71-19, HCSC_LC_8172–73.
[281] *See* ECF No. 71-18, HCSC_LC_8095–96, 8100 (despite displaying aggression, F.C. did not exhibit relational issues with staff and the incidents required no emergency physical interventions nor closeness).
[282] *Id.* at 8088.

positive behavior, mood, and thoughts.[283] She felt on August 22 "like her self[-]worth, self-harm, and feelings of despair have all gone down in the past week."[284] On August 23, CALO removed F.C. from "safety closeness."[285] She had a successful Labor Day visit with her family.[286] When she had a homicidal ideation in late September, she promptly reported it.[287] By October, her therapists reported an improvement in her mental health.[288] She had two home visits during this time.[289] F.C. had "improved greatly" by November in her ability to self-regulate and had improved in her capacity to recognize and take responsibility for her negative thoughts.[290]

F.C.'s improvement was marked, but not linear or free from problematic behavior. From February to early May 2019, there are a number of negative incidents, including some homicidal and suicidal ideations.[291] But these incidents occurred after CALO removed F.C.'s access to Midas, her canine therapy dog—between February 11 and 16—and they were apparently at least partly in reaction to the loss.[292] As CALO admitted, the forced removal was a "huge loss to her."[293] Dysregulation occurring in the wake of an RTC's action is not strong evidence RTC treatment—as opposed to participation in a partial hospitalization program—was required.

---

[283] ECF No. 71-19, HCSC_LC_8173, 8179.

[284] ECF No. 58-15, HCSC_LC_6569.

[285] *See* ECF No. 71-19, HCSC_LC_8134–67 ("safety closeness" required on August 22 but not August 23–31).

[286] ECF No. 58-15, HCSC_LC_6569.

[287] ECF No. 71-16, HCSC_LC_7963–64 (noting on F.C.'s September 30, 2018 review that she required "only one restraint[], one incident report[] and one safety assessment").

[288] *See id.* at 7966; ECF No. 71-25, HCSC_LC_9362; ECF No. 47-20, HCSC_LC_10625); ECF No. 47-20, HCSC_LC_10859 ("She has made much progress! . . . . I am stoked at her progress[.]").

[289] *See* ECF No. 58-15, HCSC_LC_6569.

[290] ECF No. 71-25, HCSC_LC_9362.

[291] *See, e.g.*, ECF No. 58-15, HCSC_LC_6569 (February 16–23: running away during a home visit); ECF No. 71-32, HCSC_LC_16042 (March 4: expressing a desire to slit a classmate's throat); *id.* at 16020 (March 9: suicidal ideation); ECF No. 71-30, HCSC_LC_15729 (April 9: stating a desire to hurt someone); ECF No. 71-31, HCSC_LC_15859 (May 5: banging head against the ground).

[292] *See* ECF No. 71-6, HCSC_LC_4390 ("[T]hese gestures, while taken seriously, are [F.C.]'s struggle to feel in control of her environment after the loss of her canine Midas . . . ."). CALO staff removed F.C.'s access to Midas between February 11 and 16, 2019. *See* ECF No. 58-9, HCSC_LC_4695; ECF No. 47-20, HCSC_LC_10181.

[293] ECF No. 71-30, HCSC_LC_15752.

Additionally, F.C.'s therapist stated on March 14 that F.C. had been untruthful and manipulative.[294] Despite this string of disruptive behaviors, F.C. had a successful home visit in June and received positive reports from her therapists in May and August.[295] Notably, when CALO discharged F.C. in January 2020, it recommended outpatient care despite F.C. exhibiting the same types of behaviors at generally the same frequency that she showed in August 2018.[296]

In sum, the record supports a finding that after August 18, 2018, F.C.'s danger to herself or others was manageable at a lower level of care (partial hospitalization), that she would have understood follow-up treatment, that a lower level of care was available, and that she would have been able to help with monitoring.[297] For this reason, a preponderance of the evidence does not support a finding that F.C.'s risk status prohibited a step-down to a partial hospitalization program or other less intensive care after August 18, 2018.[298]

### B.    Functional Status

The MCG RTC's next set of criteria involve a patient's functional status. [299] The Plan defines

---

[294] ECF No. 71-32, HCSC_LC_16077.

[295] ECF No. 71-14, HCSC_LC_7534; *see* ECF No. 71-15, HCSC_LC_7714 (physician's observations on medication management update).

[296] *See* ECF No. 71-12, HCSC_LC_6960–61 ("Due to . . . on-going symptoms/behaviors 10% of the time, [F.C.] requires outpatient individual psychotherapy, family therapy, and psychiatric care to manage medications."). CALO found discharge appropriate because F.C. exhibited "emotional stabilization" and "physically safe behavior 90% of the time." *Id.* at 6961. Yet CALO noted that F.C. still had "[u]nresolved negative core beliefs[,] . . . [s]truggles with verbal and physical passive aggression[,] . . . [s]truggles with thoughts of harming self[,] . . . [r]estricting and purging[,] . . . [and] [s]ocial withdraw when feeling depressed." *Id.*

[297] *See* ECF No. 47-22, HCSC_LC_23090–91; ECF No. 47-18, HCSC_LC_9699.

[298] *See* ECF No. 47-19, HCSC_LC_9717; ECF No. 47-24, HCSC_LC_35278.

[299] *See* ECF No. 71-29, HCSC_LC_9698–99; ECF No. 47-22, HCSC_LC_23090.

██████[300] The reviewer in the second denial letter found that F.C.'s "functioning was good," she was "cooperative with treatment," and she "had developed healthy coping skills."[301]

Plaintiffs contend that F.C. "disengage[d] from the world and slip[ped] into a depressive state" between August 4, 2018, and December 19, 2018,[302] and note times where F.C. struggled with food intake and purging.[303] Plaintiffs contend that the purging and food restriction show that F.C. would not "have been medically safe with less supervision" and that her struggles would "worsen at a lower level of care."[304] Blue Cross argues that the record contains twenty isolated incidents of food restriction or purging after August 18, 2018.[305] It points to the characterization of F.C.'s functioning as "good"—meaning no significant impairment.[306]

The evidence shows that F.C.'s functional status was acceptable for discharge to a lower level of care as of August 18, 2018. The Plan identifies feeding and hydrating oneself as the prototypical example for what constitutes an "essential function." F.C. had issues with sometimes refusing to eat or drink and purging.[307] Yet CALO never diagnosed her with an eating disorder.[308] Instead, CALO managed her food issues by scheduling regular dietician appointments and offering additional snacks and meal supplements.[309] When F.C. informed staff that she had not

---

[300] ECF No. 47-22, HCSC_LC_23099.
[301] ECF No. 47-24, HCSC_LC_35279.
[302] Pl. MSJ 29.
[303] *See id.* at 2, 29–30.
[304] Pl. Reply 14–15.
[305] *See* Def. Opp'n 18–19.
[306] *Id.* at 26.
[307] *See, e.g.*, ECF No. 71-35, HCSC_LC_21383 (August 18, 2018); ECF No. 71-36, HCSC_LC_21415 (September 6, 2018); ECF No. 71-37, HCSC_LC_21467 (October 4, 2018), 21469 (October 5, 2018); ECF No. 61-14, HCSC_LC_21561 (December 15, 2018); ECF No. 71-31, HCSC_LC_15971 (February 28, 2019); ECF No. 71-32, HCSC_LC_16003 (March 12, 2019), 16017 (March 10, 2019); ECF No. 58-16, HCSC_LC_7042 (October 24, 2019), 7083–84 (November 3, 2019), 7134 (November 13, 2019), 7204 (November 19, 2019); ECF No. 71-11, HCSC_LC_6872 (December 15, 2019).
[308] *See* ECF No. 47-7, HCSC_LC_4886; ECF No. 58-15, HCSC_LC_6558.
[309] *See* ECF No. 71-10, HCSC_LC_5665–71.

had much to eat in three days and that she had been purging, CALO sent her for a nurse checkup.[310] Three days later at a medication management update, her doctor did not mention a possible eating disorder.[311] Neither did the next day's safety assessment.[312] Even if the purging and restriction impaired F.C.'s ability to eat and drink normally, the evidence shows that these behaviors could have been managed at a lower level of care, like a partial hospitalization program.

Likewise, Plaintiffs' emphasis on F.C.'s intermittent refusals to wake up early in the morning and her decisions to isolate or sleep during free time is misplaced. Nothing about this behavior demonstrates the need for 24-hour residential care. The record further shows that F.C. did not utterly "disengage from the world."[313] On the whole, she participated in assigned events and cooperated in her treatment. That she was sometimes defiant and uncooperative does not establish the need for 24-hour residential treatment. For these reasons, the record shows that F.C. had an acceptable functional status after August 18, 2018.[314]

### C.   Medical Needs

The last set of Plan criteria include ███████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████[315] Between the two denial letters, the Blue Cross reviewers found that F.C. was "medically stable," "tolerating medications," "cooperative with treatment," and without "severe psychosis" or "severe medical

---

[310] ECF No. 71-31, HCSC_LC_15971.
[311] *See* ECF No. 61-1, HCSC_LC_15965.
[312] *See id.* at 15962.
[313] Pl. Opp'n 8.
[314] ECF No. 47-24, HCSC_LC_35279 ("functioning was good").
[315] ECF No. 71-29, HCSC_LC_9698–99; ECF No. 47-22, HCSC_LC_23090–91.

issues."[316] 

[317]

Plaintiffs argue that F.C. suffered from an eating disorder, shown by instances of purging and refusals to eat.[318] Accordingly, they argue that Blue Cross failed to engage with F.C.'s eating disorder other than stating that she had no "severe medical issues."[319] Blue Cross argues that CALO never diagnosed or treated F.C. with an eating disorder. It contends that Plaintiffs fail to prove that F.C. had unmanageable complications.[320]

There is no allegation that Blue Cross failed to note an adverse medication effect, medical comorbidity, or substance-related disorder besides the alleged eating-disorder complication. On that basis, the record supports Blue Cross's decision to deny benefits. F.C.'s sporadic incidents of purging or restriction could have been safely treated in a different setting such as a partial hospitalization program.[321] The record further supports the conclusion that F.C. was "medically stable."[322] Indeed, the only restrictions enacted by CALO regarding F.C.'s eating issues were weight checks, meal substitutes, supplements, and double snacks three times a day.[323] CALO's December 2019 treatment update and January discharge paperwork confirm that F.C. had no

---

[316] ECF No. 47-19, HCSC_LC_9717; ECF No. 47-24, HCSC_LC_35279.
[317] ECF No. 47-22, HCSC_LC_23094.
[318] *See* Pl. MSJ 29.
[319] *Id.* at 29–30, 33–34. Plaintiffs' point is that since Blue Cross used the modifier "severe," it admitted that F.C. had a medical complication and thus needed to address in the denial letters why the complication was manageable. *Id.* at 33–34.
[320] Def. Opp'n 19–20.
[321] ECF No. 47-24, HCSC_LC_35279. For a list of times where F.C. refused to eat or admitted to purging, see Pl. MSJ 12–18.
[322] ECF No. 47-19, HCSC_LC_9717.
[323] *See* ECF No. 71-10, HCSC_LC_5665–71 (CALO dietician's recommendations).

eating disorder diagnoses.[324] The fact that CALO did not elevate these concerns to a medical diagnosis, or recommend more than dietary consultations, supports the finding that F.C. could have been treated at a lower level of care.

For all of the foregoing reasons, Plaintiffs have failed to demonstrate by a preponderance of the evidence that Blue Cross was required to continue providing 24-hour RTC coverage beyond August 18, 2018. Instead, the record evidence supported Blue Cross's decision to deny Plaintiffs coverage for treatment at CALO after August 18, 2018, and to offer coverage for less intensive treatment like partial hospitalization. Without question, Blue Cross moved quickly to deny additional RTC coverage when F.C.'s risk status, functional status, and medical needs could be addressed at a less intensive treatment setting. However, the record does not support a finding that the coverage decision was incorrect.

## II.   The Record Does Not Show that Blue Cross Violated the Parity Act.

Both parties also move for summary judgment on the Parity Act claim. Plaintiffs contend that Blue Cross violated the Parity Act by applying medical necessity criteria for RTCs differently from criteria for comparable medical or surgical services. Blue Cross responds that there is no evidence of a Parity Act violation. "[T]he court affords [the parties] no deference in interpreting the Parity Act because the interpretation of a statute is a legal question."[325]

---

[324] *See* ECF No. 71-12, HCSC_LC_6952–81; ECF No. 58-16, HCSC_LC_6982–7031. The only mention was a notation that F.C. needed to "continue work . . . in therapy regarding . . . [b]ody image issues (i.e., restricting and purging)." ECF No. 71-12, HCSC_LC_6961.
[325] *Jonathan Z.*, 2022 WL 2528362, at *9.

### A.    The Parity Act

The Parity Act, "codified at 29 U.S.C. § 1185a, is an amendment to ERISA that is enforced through equitable relief under § 1132(a)(3)."[326] "Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."[327] The Act "requires that a plan that provides for 'both medical and surgical benefits and mental health or substance use disorder benefits' must not impose more restrictive treatment limitations on the latter than it imposes on the former."[328]

"A comparison of treatment limitations under MHPAEA must be between mental health/substance abuse and medical/surgical care 'in the same classification.'"[329] Federal rules label RTC, SNF, and IRF as "intermediate services"—between inpatient and outpatient treatment. "There are two types of treatment limitations under the [Parity Act]—quantitative limitations and nonquantitative treatment limitations ("NQTLs")."[330] At issue here are NQTLs.[331] "An NQTL is a limitation on 'the scope or duration of benefits for treatment under a plan or coverage.'"[332] Examples include "restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services provided under the plan or coverage."[333] Not all NQTLs are prohibited. "A health plan complies

---

[326] *Peter M. v. Aetna Health & Life Ins.*, 554 F. Supp. 3d 1216, 1226 (D. Utah 2021).
[327] *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019) (quoting *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016)).
[328] *Jonathan Z.*, 2022 WL 2528362, at *17 (citing 29 U.S.C. § 1185a(a)(3)(A)).
[329] *Peter M.*, 554 F. Supp. 3d at 1226–27 (quoting 29 C.F.R. § 2590.712(c)(4)(i), 2(ii)(A)).
[330] *D.H. v. Blue Cross Blue Shield of Ill.*, No. 2:21-cv-00334, 2022 WL 1211515, at *2 (D. Utah Apr. 25, 2022).
[331] *See* Compl. ¶ 52.
[332] *D.H.*, 2022 WL 1211515, at *2 (quoting 29 C.F.R. § 2590.712(a)).
[333] 29 C.F.R. § 2590.712(c)(4)(ii)(H).

with the MHPAEA so long as the 'processes, strategies, evidentiary standards, or other factors' the health plan uses to apply the NQTL 'are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors' the health plan uses to apply the NQTL to medical/surgical benefits in the same classification."[334]

To prevail on their Parity Act claim, Plaintiffs must show that "(1) the Plan is subject to [the Parity Act]; (2) the Plan provides benefits for both mental health/substance abuse and medical/surgical treatments; (3) [Blue Cross] place[s] differing limitations on benefits for mental health care as compared to medical/surgical care; and (4) the limitations on mental health care are more restrictive."[335] Plaintiffs have the burden of proof.[336] The parties do not dispute that the Plan is subject to the Parity Act and provides both mental health and medical or surgical treatments. The issue is whether Blue Cross put more restrictive limitations on mental health care compared to analogous medical or surgical care.

### B.    Alleged As-Applied Violation

Plaintiffs contend that Blue Cross committed an as-applied violation of the Parity Act because it used acute criteria to determine whether sub-acute mental health care was medically necessary for F.C.'s residential treatment at CALO.[337] In effect, Plaintiffs argue that Blue Cross

---

[334] *D.H.*, 2022 WL 1211515, at *2 (quoting § 2590.712(c)(4)(i)); *see also Anne M. v. United Behavioral Health*, No. 2:18-cv-808, 2022 WL 3576275, at *10 (D. Utah Sept. 19, 2022).

[335] *Peter M.*, 554 F. Supp. 3d at 1227; *see also Jonathan Z.*, 2022 WL 2528362, at *17 (citing *David S. v. United Healthcare Ins.*, No. 2:18-cv-803, 2019 WL 4393341, at *3 (D. Utah Sept. 13, 2019)). "Essentially, the Parity Act requires ERISA plans to treat sicknesses of the mind in the same way that they would a broken bone." *Munnelly v. Fordham Univ. Fac.*, 316 F. Supp. 3d 714, 727–28 (S.D.N.Y. 2018) (cleaned up).

[336] *See Stone v. UnitedHealthcare Ins*, 979 F.3d 770, 774 (9th Cir. 2020); *James C. v. Anthem Blue Cross & Blue Shield*, No. 2:19-cv-38, 2021 WL 2532905, at *20 (D. Utah June 21, 2021), *appeal dismissed* (Nov. 30, 2021).

[337] Pl. MSJ 36. As Plaintiffs explain, SNFs are "medical/ surgical analogues to residential treatment center mental health benefits." Pl. Reply 16.

imposed greater limitations on RTC benefits than for SNFs.[338] Among other things, the second

denial letter stated that F.C. "did not appear to be imminently dangerous," that her attempts to

harm herself were not severe, she "had no severe aggression," and she "had no severe

psychosis . . . [or] severe medical issues."[339] Thus, Plaintiffs argue that Blue Cross would need to

discharge patients from SNFs or IRFs on the basis of an absence of comparable acute symptoms,

such as lack of severe medical conditions or if the patient was not in imminent danger.[340] They

contend that the Plan's indications for discharge from a SNF or IRF do not show such a

requirement.[341]

Blue Cross contends that Plaintiffs have offered no evidence of an as-applied violation. It

asserts that an as-applied challenge demands a party show that the pertinent NQTLs were applied

more strictly to mental health treatment than medical or surgical care.[342] Merely citing the Plan

guidelines is not enough.[343]

Under the Parity Act, a plaintiff can "make an as-applied challenge by alleging that,

although the same nonquantitative treatment limitation is applied to both mental health/substance

use disorder benefits and to medical/surgical benefits, it is not applied in a comparable way."[344]

If the as-applied challenge involves NQTLs, as it does in this case, the Act "requires only that

---

[338] Pl. Reply 16 ("[I]t is a clearly established principle of law that [Blue Cross] violated MHPAEA if it imposed a stricter limitation on residential treatment center benefits than on skilled nursing facility benefits.").
[339] ECF No. 47-24, HCSC_LC_35279.
[340] *See* Pl. MSJ 37; *Jonathan Z.*, 2022 WL 2528362, at *20 ("Plaintiffs further argue that [the claims administrator] improperly required Daniel to exhibit acute symptoms to qualify for RTC care . . . whereas [the administrator] does not require similarly acute symptoms for comparable medical-surgical treatment.").
[341] Pl. MSJ 36–37; ECF No. 47-32, HCSC_LC_46182; ECF No. 47-33, HCSC_LC_46203–04.
[342] *See* Def. MSJ 37 (citing 45 C.F.R. § 146.136(c)(4)(i)).
[343] *Id.* at 37–38 (citing *Michael P. v. Aetna Life Ins.*, No. 2:16-cv-00439, 2017 WL 4011153, at *7 (D. Utah Sept. 11, 2017) ("[Plaintiffs] point to no evidence of record which persuades the Court that the Plan is noncompliant with the Parity Act.")).
[344] *J.L. v. Anthem Blue Cross*, No. 2:18-cv-00671, 2019 WL 4393318, at *2 (D. Utah Sept. 13, 2019).

[NQTLs] for mental health benefits be '*comparable to*' and 'applied no more stringently than for medical/surgical benefits.'"[345] "The difference in requirements is not necessarily an improper limitation on mental health care, but recognition of the inherent difference in treatment at those facilities."[346] Ultimately, a plaintiff must show "that the mental health or substance abuse services at issue meet the criteria imposed by [the] insurance plan and that the insurer imposed some additional criteria to deny coverage of the services at issue."[347]

Plaintiffs fail to prove an as-applied challenge to the Parity Act for two reasons. They offer no evidence to show that the criteria for RTC claims is more restrictive than the criteria for SNF claims. And they fail to show that Blue Cross actually applied more stringent criteria to deny RTC care than the MCG RTC criteria permitted.

Plaintiffs must do more to show a Parity Act violation than recite the applicable guidelines and allege that Blue Cross applies NQTLs more stringently for mental health care at RTCs than for comparable medical or surgical treatment. They have not done so here. They merely assert that "[t]he Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits."[348] But Plaintiffs cite no evidence at all of how Blue Cross applies

---

[345] *Anne M.*, 2022 WL 3576275, at *10 (quoting 29 C.F.R. § 2590.712(c)(4)(iii)); *see James C.*, 2021 WL 2532905, at *20 ("[T]he fact that the guidelines for mental health and medical/surgical treatment impose different thresholds for determining when an illness is severe enough to necessitate treatment is not an impermissible disparity; it is a logical consequence of the undeniable reality that every illness is inherently different and requires different treatment. This is why the Parity Act only requires comparability, not equality, between limitations for [RTCs] and [SNFs].").

[346] *Michael P.*, 2017 WL 4011153, at *7.

[347] *Anne M. v. United Behavioral Health*, No. 2:18-cv-808, 2019 WL 1989644, at *2 (D. Utah May 6, 2019) (quoting *H.H. v. Aetna Ins.*, 342 F. Supp. 3d 1311, 1319 (S.D. Fla. 2018)).

[348] Compl. ¶ 63. In support, Plaintiffs point to the Plan guidelines for SNFs and IRFs. *See* ECF No. 47-32, HCSC_LC_46181–82; ECF No. 47-33, HCSC_LC_46203–04.

SNF or IRF guidelines.[349] The record contains no evidence that Blue Cross actually applies more stringent criteria to RTC claims than it does to SNF or IRF claims. Plaintiffs' claims "are merely conclusory allegations devoid of factual support."[350] And so their "as-applied challenge necessarily fails."[351]

Indeed, Plaintiffs appear to concede that they have offered no evidence as to how Blue Cross actually applies SNF guidelines.[352] They argue that the matter "presents an interesting conundrum."[353] Should Blue Cross "impose[] limitations beyond the MCGs, the guidelines which it specifically uses to determine whether skilled nursing care is 'medically necessary[,]' then [Blue Cross]'s representation in its answer is at odds with [its] fiduciary obligations."[354] In short, Plaintiffs contend that Blue Cross must produce evidence as to whether it would require a patient in a SNF or IRF to show severe symptoms or be at immediate risk of harm for continued admission.[355]

The burden is on Plaintiffs—not Blue Cross—to show a violation of the Parity Act. At this point, it is mere speculation as to whether Blue Cross applies more strictly the guidelines or criteria for residential treatment than for skilled nursing or inpatient rehabilitation care. That

---

[349] *See* ECF No. 47-19, HCSC_LC_9717–18; ECF No. 47-24, 35278–79.

[350] *Anne M.*, 2019 WL 1989644.

[351] *Anne M.*, 2022 WL 3576275, at *11 ("[T]he court notes that Plaintiffs have failed to identify . . . any evidence, apart from [the plaintiff]'s experience, of how the [Plan] guidelines are applied in practice. Absent such evidence, Plaintiffs' as-applied challenge necessarily fails."); *see also Mike G. v. BlueCross Blueshield of Tex.*, No. 2:17-cv-347, 2019 WL 2357380, at *16 (D. Utah June 4, 2019) ("Plaintiffs argue that the [MCG] improperly apply acute requirements for sub-acute residential mental health treatment, but there is no evidence before the Court that Blue Cross applied less stringent requirements for medical/surgical benefits. Without such evidence, Plaintiffs' Parity Act claim must fail.").

[352] *See* Pl. Reply 17–18.

[353] *Id.* at 18.

[354] *Id.* (quoting 29 U.S.C. § 1104(a)).

[355] *Id.* at 19.

Plaintiffs can articulate a theory as to how a violation could have occurred is insufficient to either obtain summary judgment or defend against it.

Plaintiffs' focus on the denial letters' language while excluding reference to the MCG RTC is not enough to show a Parity Act violation. Pursuant to the second denial letter, F.C. did not meet MCG RTC guidelines in part because she "did not appear to be imminently dangerous"; "mild attempts to harm [herself] . . . were not severe"; she "had no severe aggression toward others;" she "had no severe psychosis"; and she "had no severe medical issues."[356] Alone, these statements could indicate that continued care at an RTC facility required acute symptoms. In context of the MCGs, however, continued RTC treatment required consideration of other treatment options along the full continuum of care.[357]

As the MCG RTC and MCG MDD specify,



[358] All three sets of criteria under the first prong—risk status, functional status, and medical needs—ask reviewers to determine whether the patient's condition was manageable or could be managed at a lower level of care.[359] Contrary

---

[356] ECF No. 47-24, HCSC_LC_35279.

[357] While the denial letters may be sufficient, they are not a paragon of clarity or completeness. *See* ECF No. 47-19, HCSC_LC_9717; ECF No. 47-24, HSCSC_LC_35279. The letters fail to tie proffered facts to specific guideline requirements. And the letters are short on reasoned explanations as to why the reviewers reach their conclusions. The court is not asking reviewers "to cite to specific medical records or copy verbatim plan language in their denial letters[.]" *Peter E. v. United Healthcare Servs., Inc.*, No. 2:17-cv-435, 2021 WL 5962259, at *10 (D. Utah Dec. 16, 2021). But the court expects reviewers to more clearly match their findings to the pertinent guidelines and offer better explanations as to why the findings meet the plan guidelines.

[358] ECF No. 71-29, HCSC_LC_9699; ECF No. 47-22, HCSC_LC_23090.

[359] ECF No. 71-29, HCSC_LC_9699; ECF No. 47-22, HCSC_LC_23090

to Plaintiffs' arguments, criteria for continued admission do not rest on a binary choice between the presence or absence of acute symptoms.

In support, Plaintiffs cite *Jonathan Z. v. Oxford Health Plans*.[360] In *Jonathan Z.*, the court concluded that the administrator was applying more stringent criteria for RTC care than for inpatient hospital care.[361] The denial letters in that case noted the absence of acute symptoms: that the patient was not a danger to himself or others and that he did not have suicidal or homicidal ideations.[362] Discussing the plan criteria, the court implied that the presence of suicidal or homicidal ideations—acute symptoms—necessitated inpatient hospital care.[363] As a result, the court held that the denial was due to the patient's failure to present acute care needs.[364]

Here, the Plan is different. It provides for "a continuum of mental health services that vary based on the level of intensity of services and the degree of restrictiveness of the setting in which care is provided."[365] Even if a patient presents with suicidal or homicidal ideations, should the reviewer reasonably determine that the ideations are ████████████████████████████ ████████████ then PHP or outpatient treatment might be appropriate.[366] By the same token, a patient presenting a danger of self-harm or ████████████████████████████ conditions might qualify for RTC admission.[367] Coverage is not categorically guaranteed or

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

[360] *Jonathan Z.*, 2022 WL 2528362, at *21.
[361] *Id.* at *20–21.
[362] *Id.*
[363] *Id.* at *21 ("impos[ing] a more stringent limitation on RTC care that more closely resembled the requirements for acute inpatient mental health care").
[364] *Id.*
[365] Def. MSJ 3 (citing ECF No. 47-27, HCSC_LC_45682, 45750–51).
[366] ECF No. 47-22, HCSC_LC_23090.
[367] *Id.* at 23089.

precluded with the presence or absence of certain symptoms. The MCGs instead direct reviewers to evaluate medical necessity and determine which level of care is appropriate along the continuum of care. That is what the reviewers did here.[368]

In conclusion, Plaintiffs have not met their burden to prevail on summary judgment. They have cited no record evidence that would support judgment in their favor on the MPHAEA claim. Without evidence, summary judgment against Plaintiffs and in favor of Blue Cross is required.

## ORDER

Accordingly, Defendant's motion for summary judgment is GRANTED.[369] Plaintiffs' motion for summary judgment is DENIED.[370]

Signed February 10, 2023.

BY THE COURT

David Barlow
United States District Judge

---

[368] ECF No. 47-19, HCSC_LC_9717; ECF No. 47-24, HCSC_LC_35279. *See also Anne M.*, 2022 WL 3576275, at *4, 11.
[369] ECF No. 44.
[370] ECF No. 49.